USCA1 Opinion

 

 September 24, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _____________________ No. 92-2263 MONICA SANTIAGO, Plaintiff, Appellant, v. SHERWIN WILLIAMS COMPANY, ET AL., Defendants, Appellees. _____________________ ERRATA SHEET Please make the following correction in the opinion in the above case released on September 10, 1993: Page 7, footnote 4: change the footnote to read as follows: Judge Breyer dissents. In his view, despite the equitable arguments against certification in this case, in light of the importance of the matter this panel should certify the issue to the Supreme Judicial Court. United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 92-2263 MONICA SANTIAGO, Plaintiff, Appellant, v. SHERWIN WILLIAMS COMPANY, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Joseph L. Tauro, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Friedman,* Senior Circuit Judge, ____________________ and Stahl, Circuit Judge _____________ ____________________ Jonathan Shapiro, with whom Stern, Shapiro, Rosenfeld & __________________ ________________________________ Weissberg, Robert J. Doyle, Kehoe, Doyle, Playter & Novick, Neil T. _________ _______________ ________________________________ _______ Leifer, Thornton, Early & Naumes, Judith Somberg, Johnson & Somberg, ______ _________________________ ______________ __________________ Arthur Bryant, and Trial Lawyers for Public Justice, were on brief for _____________ ________________________________ appellant. Paul Michael Pohl, with whom Charles H. Moellenberg, Jr., Jones, __________________ ____________________________ ______ Day, Reavis & Pogue, Thomas J. Griffin, Jr., Loretta Smith, Erik H. ____________________ _______________________ ______________ _______ Aldeborgh, II, Goodwin, Procter & Hoar, Dale A. Normington, were on ______________ ________________________ ___________________ brief for Sherwin-Williams Company, Rory FitzPatrick, Meghan H. _________________ __________ Magruder, Bingham, Dana & Gould, Donald A. Bright, were on brief for ________ _____________________ _________________ Atlantic Richfield Company, Michael Nilan, G. Marc Whitehead, Janie S. _____________ _________________ ________ Mayeron, Popham, Haik, Schnobrich & Kaufman, Ltd., Thomas V. Urmy, _______ __________________________________________ _______________ Shapiro, Grace & Haber, were on brief for SCM Corporation, Donald E. _______________________ _________ Scott, John M. Walker, Kirkland & Ellis, David B. Garten, and Janet D. _____ ______________ ________________ _______________ ________ Smith, were on brief for NL Industries, Inc., and Mary Morrissey _____ ______________ Sullivan, Richard Nahigian, and Sullivan, Sullivan & Pinta, were on ________ ________________ ___________________________ brief for Lead Industries Association. David G. Owen on brief for The Business Roundtable and Chamber of _____________ Commerce of the United States of America, amici curiae. Stephen S. Ostrach, Emily R. Livingston and New England Legal ___________________ ____________________ __________________ Foundation on brief for Associated Industries of Massachusetts and New __________ England Legal Foundation, amici curiae. ____________________ September 10, 1993 ____________________ ____________________ *Of the Federal Circuit, sitting by designation. STAHL, Circuit Judge. In this appeal, plaintiff- _____________ appellant Monica Santiago challenges the district court's entry of summary judgment against her and in favor of defendants-appellees.1 In so doing, plaintiff advances three arguments: (1) the legal issues in this appeal should be certified to the Massachusetts Supreme Judicial Court ("SJC"); (2) the district court erred in rejecting plaintiff's market share liability argument; and (3) the court erred in rejecting plaintiff's concert of action claim. After carefully reviewing each of plaintiff's arguments, we affirm. I. I. __ BACKGROUND BACKGROUND __________ Plaintiff was born on November 9, 1972. From the time of her birth until 1978, she and her family resided at 20 Leston Street in Boston. Plaintiff alleges that, during her period of residence, she ingested lead paint that had been applied in layers to the walls and woodwork of her home at various times between 1917, the year of the building's construction, and 1970. The evidence reveals that ____________________ 1Defendants are Sherwin-Williams Company, NL Industries, Inc., Eagle-Picher Industries, Inc., Atlantic Richfield Corporation (successor to International Smelting & Refining Company), and SCM Corporation (successor to Glidden Company). On January 7, 1991, defendant Eagle-Picher filed for bankruptcy in Ohio, thus automatically staying this action against it. See 11 U.S.C. 362. ___ -3- plaintiff's blood had highly elevated levels of lead by the time plaintiff was one year of age, that the lead reached emergency levels by July 1976, and that, as a consequence, plaintiff had to undergo chelation therapy2 in order to remove the lead from her body. Although plaintiff's early development appeared to progress normally, she has been diagnosed with a hyperactivity-attention disorder and motor skill difficulties which her medical experts attribute to lead poisoning. Plaintiff initiated this action in November 1987, contending that defendants, or their predecessors in interest, manufactured and marketed all, or virtually all, of the white lead used in the lead paints sold in the United States between 1917 and 1970. Her complaint set forth claims of negligence, breach of warranty, and concert of action. Jurisdiction was premised upon diversity of citizenship. See ___ 28 U.S.C. 1332. Plaintiff could not and cannot identify either which, if any, of the defendants are the source of the lead she ingested or when the alleged injury-causing paint may have been applied to the walls and woodwork of her childhood ____________________ 2Chelation therapy is a procedure whereby a person with lead poisoning is given chemicals that bind with the lead, enabling the body to excrete it more rapidly. -4- home.3 She has, however, introduced (1) evidence in the form of expert testimony that lead paint "was at minimum a substantial contributing factor of her lead poisoning;" (2) evidence demonstrating that all of the defendants produced white lead for significant portions of the period between 1917 and 1970; (3) evidence that almost all of the white lead produced for paint between 1917 and 1970 was manufactured by defendants; and (4) evidence that, between 1930 and 1945, all of the defendants, as members of a trade association known as the Lead Industries Association ("LIA"), "simultaneously coordinat[ed] promotional campaigns to increase white lead consumption in paint and . . . work[ed] to neutralize the growing public concern about lead paint poisoning." On the basis of this evidence, plaintiff sought to dispense with the identification requirement and hold defendants liable under a market share theory. Plaintiff further argued that defendants were liable for her injuries because of their concerted marketing actions as members of the LIA. By memorandum and order dated January 13, 1992, the district court rejected plaintiff's market share claim as a matter of Massachusetts law. In so doing, the court ruled ____________________ 3There is no direct evidence that plaintiff actually ate lead ______ paint. There is, moreover, record evidence suggesting that, in addition to lead paint, plaintiff could have been exposed to airborne lead, lead from food and water, and/or lead from soil and dust. Indeed, there is evidence indicating that plaintiff's neighborhood, including the soil around her home, was heavily contaminated with lead. -5- that even if the SJC would recognize market share liability under some scenario, it would not do so if presented with the undisputed facts of this case. See generally Santiago v. ___ _________ ________ Sherwin-Williams Co., 782 F. Supp. 186 (D. Mass. 1992). By ____________________ memorandum and order dated July 2, 1992, the court further ruled that plaintiff's concert of action claim failed as a matter of Massachusetts law because plaintiff could not identify which of the defendants actually had committed the tort. See generally Santiago v. Sherwin-Williams Co., 794 F. ___ _________ ________ ____________________ Supp. 29 (D. Mass. 1992). It is from these rulings that plaintiff now appeals. II. II. ___ DISCUSSION DISCUSSION __________ A. Certification A. Certification _________________ As an initial matter, plaintiff has requested that we certify to the SJC questions regarding the viability of market share liability and concert of action as theories of recovery in light of the facts of this case. We note that plaintiff first requested certification in this court, and explicitly stated her opposition to certification at the __________ district court level. Now, having lost below, plaintiff has reversed her position. Unsurprisingly, defendants oppose plaintiff's certification request. For reasons that are largely self-explanatory, we have held that "one who chooses to litigate [her] state -6- action in the federal forum (as plaintiff did here) must ordinarily accept the federal court's reasonable interpretation of extant state law rather than seeking extensions via the certification process." Croteau v. Olin _______ ____ Corp., 884 F.2d 45, 46 (1st Cir. 1989); see also 17A Charles _____ ___ ____ A. Wright, Arthur R. Miller, and Edward H. Cooper, Federal _______ Practice and Procedure 4248, 176 (2d ed. 1988) (courts _______________________ "should be slow to honor a request for certification from a party who chose to invoke federal jurisdiction"). The concerns about fundamental fairness and judicial economy that animate this general rule make us considerably less inclined to depart from it when the plaintiff did not request certification before the district court. See Croteau, 884 ___ _______ F.2d at 46. Here, as will be demonstrated below, the district court's interpretation of Massachusetts law was eminently reasonable. Furthermore, plaintiff, after initially deciding to eschew her prerogative to file this action in state court, actively made her opposition to certification known to the district court. In light of these facts, and given the further fact that it has been over five years since these federal proceedings were initiated, it would be extremely unfair to defendants if we were to allow plaintiff to relitigate the issues at the heart of this lawsuit. -7- Accordingly, plaintiff's request for certification is denied.4 B. Standard of Review B. Standard of Review ______________________ Having dispensed with plaintiff's certification request, we proceed to delineate the parameters of our examination. Summary judgment allows courts to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st _____ ____________________________ Cir. 1992), cert. denied, 113 S. Ct. 1845 (1993). It should _____ ______ be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is only material if it has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st ________________ ______________ Cir. 1993). However, our reading of the facts, as derived from the record, is always done "`in the light most amiable to the nonmovant. . . .'" Lawrence v. Northrop Corp., 980 ________ ______________ F.2d 66, 68 (1st Cir. 1992) (quoting Garside v. Osco Drug, _______ __________ ____________________ 4Judge Breyer dissents. In his view, despite the equitable arguments against certification in this case, in light of the importance of the matter this panel should certify the issue to the Supreme Judicial Court. -8- Inc., 895 F.2d 46, 48 (1st Cir. 1990)). This includes ____ "indulg[ing] all reasonable inferences" in the nonmovant's favor. Id. ___ Our review of a summary judgment ruling is plenary. Garside, 895 F.2d at 48. Furthermore, we are not limited to _______ the reasoning employed by the district court; instead, we may "affirm the entry of summary judgment on any independently sufficient ground made manifest by the record." United ______ States v. One Parcel of Real Property, 960 F.2d 200, 204 (1st ______ ___________________________ Cir. 1992). In addition to examining the facts, a court passing on a summary judgment motion or reviewing a summary judgment determination must, of course, consider the applicable law. When a plaintiff invokes diversity jurisdiction to bring a state law claim in federal court, this survey is somewhat circumscribed, for it is settled that, in ordinary circumstances, a plaintiff who "selects a federal forum in preference to an available state forum may not expect the federal court to steer state law into unprecedented configurations." Martel v. Stafford, 992 F.2d 1244, 1247 ______ ________ (1st Cir. 1993); see also Ryan v. Royal Ins. Co., 916 F.2d ___ ____ ____ _______________ 731, 744 (1st Cir. 1990) (rejecting a diversity plaintiff's attempt to stretch New York law to new frontiers without providing a "well-plotted roadmap showing an avenue of relief that the state's highest court would likely follow"); Porter ______ -9- v. Nutter, 913 F.2d 37, 41 (1st Cir. 1990) (plaintiff who ______ seeks out a federal venue in a diversity action should expect "unadventurous" interpretations of state law). Mindful of these strictures, we turn to plaintiff's claims. C. Market Share Liability C. Market Share Liability __________________________ Plaintiff argues that the district court erred in granting defendants summary judgment on her claim for market share liability. In so doing, she concedes that the SJC has never explicitly endorsed a market share liability theory of recovery, and further recognizes that the court rejected a certain species of market share liability advanced by plaintiffs in a DES class action. See Payton v. Abbott ___ ______ ______ Labs., 437 N.E.2d 171, 188-90 (Mass. 1982).5 Nonetheless, _____ ____________________ 5In Payton, an action brought by a class of women whose ______ mothers ingested DES while pregnant with them, the United States District Court for the District of Massachusetts certified to the SJC the following question: Assuming that the evidence does not warrant a conclusion that the defendants conspired together, or engaged in concerted action, or established safety standards through a trade association, may the defendant manufacturers, who probably supplied some of the DES ingested by the mothers of the plaintiff class, be held liable to members of the plaintiff class when neither the plaintiffs nor the defendants can identify which manufacturer's DES was ingested by which mothers? Id. at 188. The SJC ruled that it could not answer the ___ question in the form stated because the question "d[id] not explicitly assume that the plaintiffs will be able to establish the negligence of . . . defendants." Id. However, ___ as is discussed more fully below, the court did set forth its general views on market share liability. In so doing, it rejected the theory of market share liability advanced by -10- plaintiff asserts that certain dicta in Payton indicate that ______ her claim would be approved by the SJC.6 We cannot agree. As the SJC has noted, "[i]dentification of the party responsible for causing injury to another is a longstanding prerequisite to a successful negligence action." Payton, 437 N.E.2d at 188. However, some courts, cognizant ______ of the modern industrial reality of fungible goods which may harm consumers but which cannot be traced to specific producers, have relaxed this identification requirement in certain negligence and product liability cases. In these cases, the courts have allowed plaintiffs who are unable to identify the particular defendant who actually manufactured the harm-causing product to pursue their claims so long as they are able to prove both that the product caused the harm and that the defendants were market suppliers at the time plaintiff had her harmful encounter with the product. See, ___ ____________________ plaintiffs in that case. Id. at 189. ___ 6In concluding its explicit rejection of the form of market share liability plaintiffs sought to impose, the Payton court ______ stated: That is not to say that on an adequate record this court would not recognize some relaxation of the traditional identification requirement in appropriate circumstances so as to allow recovery against a negligent defendant of that portion of a plaintiff's damages which is represented by the defendant's contribution of DES to the market in the relevant period of time. Id. at 190. ___ -11- e.g., Sindell v. Abbott Labs., 607 P.2d 924, 936-38 (Cal.), ____ _______ _____________ cert. denied, 449 U.S. 912 (1980). If a plaintiff prevails _____ ______ in such a case, courts typically have limited each defendant's liability to that portion of the plaintiff's judgment which reflects the share of the market supplied by the defendant at the time of said encounter. See, e.g., id., ___ ____ ___ 607 P.2d at 937. Market share liability has most often been recognized in the context of DES cases. See, e.g., McCormack ___ ____ _________ v. Abbott Labs., 617 F. Supp. 1521 (D. Mass. 1985); McElhaney ____________ _________ v. Eli Lilly & Co., 564 F. Supp. 265 (D.S.D. 1983); Conley v. _______________ ______ Boyle Drug Co., 570 So.2d 275 (Fla. 1990); Hymowitz v. Eli _______________ ________ ___ Lilly & Co., 539 N.E.2d 1069 (N.Y.), cert. denied, 493 U.S. ___________ _____ ______ 944 (1989); Martin v. Abbott Labs., 689 P.2d 368 (Wash. ______ _____________ 1984); Collins v. Eli Lilly & Co., 342 N.W.2d 37 (Wis.), _______ ________________ cert. denied, 469 U.S. 826 (1984). But see Ray v. Cutter _____ ______ ___ ___ ___ ______ Labs., 754 F. Supp. 193 (M.D. Fla. 1991) (product contained _____ HIV virus); Morris v. Parke, Davis & Co., 667 F. Supp. 1332 ______ __________________ (C.D. Cal. 1987) (plaintiff harmed by DPT vaccine); Smith v. _____ Cutter Biological, Inc., 823 P.2d 717 (Haw. 1991) (product ________________________ contained HIV virus). As noted above, the SJC did have occasion to consider, by means of a certified question, the viability of one form of market share liability in a DES case. See ___ Payton, 437 N.E.2d at 188-90. In Payton, plaintiffs argued ______ ______ for market share liability with two significant twists: (1) -12- that they be allowed to proceed against and recover full damages from only six named DES manufacturers despite the fact that there was a larger number of potential tortfeasors, and (2) that defendants should be prohibited from presenting exculpatory proof. See id. at 188-89. The court rebuffed ___ ___ these arguments, holding that two articulated reasons for the identification requirement, (1) that wrongdoers be held liable only for the harm they have caused, and (2) that tortfeasors be separated from innocent actors, would be disserved by the adoption of plaintiffs' theory. Id. ___ Accordingly, as we have stated, the SJC rejected plaintiffs' version of market share liability. Id. at 189. ___ We accept for the sake of argument plaintiff's assertions (1) that the SJC would, in some circumstances, relax the identification requirement and allow a plaintiff to recover under a market share theory; (2) that the SJC would recognize market share liability in the lead poisoning context; (3) that plaintiff has introduced sufficient evidence for a reasonable factfinder to infer that her injuries resulted from lead poisoning; (4) that lead paint was, as one of plaintiff's experts puts it, at least "a substantial contributing factor of her lead poisoning"; and (5) that defendants, who were mere bulk suppliers of white lead and did not manufacture or market the alleged injury- causing paint, could still be adjudged to have acted -13- negligently towards plaintiff. Nonetheless, we believe that the SJC's professed interest in both holding wrongdoers liable only for the harm they have caused and in separating tortfeasors from innocent actors is fatal to plaintiff's claim. Simply put, allowing plaintiff's market share claim to proceed despite plaintiff's inability to pinpoint with any degree of precision the time the injury-causing paint was applied to the house on Leston Street would significantly undermine both of the articulated reasons for the identification requirement. The record before us reflects that the layers of lead paint were applied to the house's walls at various undeterminable points in time between 1917 and 1970.7 It also indicates that defendants' contributions to the lead paint market varied significantly during this time period. Given these facts, it is difficult to discern the basis upon which any market share determination would be premised.8 At any rate, it is evident that the adoption of ____________________ 7Plaintiff did introduce expert testimony attempting to date one of the multi-layered paint samples taken from the house. However, this expert was only able to say that one layer of lead paint probably was applied between 1933 and 1939, and that a second layer of lead paint was probably applied between 1955 and 1969. 8Apparently, plaintiff would have market share determined according to an average of defendants' market shares over time. Because such an approach would virtually guarantee a deviation between liability and actual culpability for all the named defendants, we are confident that the SJC would look upon it with disfavor. -14- plaintiff's theory would not be consistent with the SJC's admonition that wrongdoers be held liable only for the harm they have caused. Moreover, several of the defendants were not in the white lead pigment market at all for significant portions of the period between 1917 and 1970, and therefore may well not have been market suppliers at the time the injury-causing paint was applied to the walls of plaintiff's home. This, of course, raises a substantial possibility that these defendants not only could be held liable for more harm than they actually caused, but also could be held liable when they did not, in fact, cause any harm to plaintiff at all. Under plaintiff's theory, therefore, tortfeasors and innocent actors would not be adequately separated. Finally, we note that the dicta relied upon by plaintiff indicates that a relaxation of the identification requirement to allow recovery against a negligent defendant would only be appropriate to the extent that the recovery represents "that portion of a plaintiff's damages which is represented by that defendant's contribution . . . to the market in the relevant period of time." Id. at 190 (emphasis __ ___ ________ ______ __ ____ ___ supplied). Here, as noted, plaintiff cannot identify with adequate specificity the relevant period of time. Thus, it appears that plaintiff's theory does not fall within even the vague parameters mentioned in the SJC's dicta. -15- In sum, allowing plaintiff to recover her full damages from the five named defendants despite her inability to specify the time of their negligence may well, on this record, do violence to the SJC's stated interest in ensuring that wrongdoers be held liable only for the harm they have caused. It also would create a substantial possibility that tortfeasors and innocent actors would be impermissibly intermingled. The SJC has made it abundantly clear that it would not countenance either result. Accordingly, mindful that federal courts sitting in diversity at a plaintiff's election ought not "steer state law into unprecedented configurations," see Martel, 992 F.2d at 1244, we affirm the ___ ______ district court's grant of summary judgment to defendants on plaintiff's market share claim.9 D. Concert of Action D. Concert of Action _____________________ Finally, plaintiff contends that the district court erred in granting defendants summary judgment on her concert of action claim. Again, we cannot agree. ____________________ 9We are aware that the United States District Court for the District of Massachusetts, relying on the dicta in Payton, ______ approved a market share theory of recovery in a DES case. See McCormack, 617 F. Supp. at 1525-26. We note simply that ___ _________ the McCormack case was never appealed and that we have not _________ had, nor do we now have, occasion to pass on the correctness of its holding. We further note that the aspect of this case upon which we rest our preclusion of plaintiff's market share claim -- plaintiff's inability to identify the time of defendants' alleged negligence -- was not present in McCormack. _________ -16- Plaintiff's concert of action claim is premised upon the theory of liability set forth in Section 876 of the Restatement (Second) of Torts (1977). In relevant part, Section 876 (entitled "Persons Acting in Concert") provides: For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . . In isolated circumstances, Massachusetts courts have indicated their willingness to permit recovery under theories tracking the language of Section 876. E.g., Orszulak v. ____ ________ Bujnevicie, 243 N.E.2d 897, 898 (Mass. 1969) ("Persons who __________ race automobiles on a public way are liable in negligence for injuries caused by one of them."); Nelson v. Nason, 177 ______ _____ N.E.2d 887, 888 (Mass. 1961) (similar). In essence, plaintiff claims that, "in light of the substantial medical evidence of the unreasonable risk that [lead paint] posed to young children[,]" certain of defendants' actions as members of the LIA between 1930 and 1945 were tortious. Specifically, plaintiff points to defendants' "initiat[ion of] nationwide promotional campaigns, encourage[ment of] the use of white lead in house paint through extensive advertising, [attempts] to undermine -17- the growing medical evidence of the danger of lead paint, and work[] to prevent the enactment of governmental regulations which would have restricted the use of white lead in painting buildings."10 What is utterly lacking from her presentation, however, is any evidence that these actions, during the fifteen year period she identifies, had any role ___ in causing lead paint to be applied to the walls of her childhood home. Even if we assume that at least some of the lead paint consumed by plaintiff was applied to her home during the period of defendants' alleged concerted actions, there is no evidence that the application resulted from these __ actions, or that it would not have taken place in the absence of these actions. Cf. Roberts v. Southwick, 614 N.E.2d 659, ___ _______ _________ 663 (Mass. 1993) (endorsing instruction defining proximate cause as "that which, in continuous sequence, unbroken by a new cause, produces an event, and without which the event would not have occurred"). Thus, it is our view that the factfinder could only have based a causation finding on speculation or conjecture. Clearly, this is inappropriate under Massachusetts law. See Goffredo v. Mercedes-Benz Truck ___ ________ ___________________ Co., 520 N.E.2d 1315, 1317-18 (Mass. 1988); Gynan v. Jeep ___ _____ ____ Corp., 434 N.E.2d 688, 691 (Mass. App. Ct.) (plaintiff "could _____ not leave causation merely to speculation and conjecture"), ____________________ 10Plaintiff acknowledges, however, that she has no evidence that defendants ever concealed information or introduced false research into public debate. -18- review denied, 440 N.E.2d 1177 (Mass. 1982); see also W. Page ______ ______ ___ ____ Keeton et al., Prosser and Keeton on Torts 41, at 269 (5th ___________________________ ed. 1984) ("The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."). We acknowledge that the question of causation is generally for the factfinder. See Mullins v. Pine Manor ___ _______ ___________ College, 449 N.E.2d 331, 338 (Mass. 1983). Where there is no _______ evidence from which the factfinder, without speculating, can find causation, however, the case is appropriately kept from the jury. See Goffredo, 520 N.E.2d at 1318. We believe that ___ ________ this is such a case. Accordingly, we affirm the district court's decision to award defendants summary judgment on plaintiff's concert of action claim.11 ____________________ 11We recognize that the district court based its summary judgment decree on the fact that plaintiff was unable to identify any of the defendants specifically as tortfeasors. See Santiago, 794 F. Supp. at 33. We also recognize that ___ ________ plaintiff has spent much effort challenging this ruling. As noted above, however, we are free to affirm the entry of summary judgment on any independently sufficient ground made manifest by the record. One Parcel of Real Property, 960 ____________________________ F.2d at 204. Because we do so here, we do not reach the correctness of the district court's decision. -19- III. III. ____ CONCLUSION CONCLUSION __________ Because certification to the SJC of the issues raised in this appeal would be inappropriate, plaintiff's request therefor is denied. Furthermore, because the district court correctly ruled that plaintiff's market share and concert of action claims fail as a matter of law, we affirm its granting of defendants' motions for summary judgment thereon. Affirmed. Costs to appellees. Affirmed. Costs to appellees. ________ __________________ -20-